THE PEOPLE OF THE STATE OF NEW YORK ex rel. JOHN H. DELANEY, as Transit Construction Commissioner, Respondent, for a Writ of Mandamus against INTERBOROUGH RAPID TRANSIT COMPANY, Appellant.

First Department, July 2, 1920.

Mandamus — act commanded to be performed to be specific — peremptory writ to be based on clear legal right — city of New York — compelling railroad company to change line equipment to permit use of cars of another railroad under trackage agreement — contract between city and defendant for construction of road imposing no obligation to so construct as to permit use of cars of different type adopted by other railroad.

The proper function of the writ of mandamus is to compel the doing of a specific thing based upon a legal right.

Accordingly, a peremptory writ should not have been issued to compel the defendant to comply with the order of the Transit Construction Commissioner requiring the defendant to make all such changes in the equipment of certain subdivisions of a rapid transit railroad line in New York city *as may be necessary* to provide for the exercise of the trackage rights reserved by the city and granted to another railway company, for the order is too indefinite to be enforced by mandamus in that it does not point out specifically the changes to be made, nor recite any reason why the structural equipment must be radically altered merely for the purpose of allowing another company to use the tracks.

A peremptory writ of mandamus will not be issued unless it appears that there is a clear legal right to have that done which it is petitioned should be commanded to be done.

A peremptory writ of mandamus should not have been issued to compel the
defendant to comply with the order of the Transit Construction Com-
missioner of New York city which required the defendant to alter its line
equipment so as to permit the use by another railroad under the trackage
agreement entered into between the two railroads and the city of cars of a
type different from those in use on the existing railroads in New York
city, for the contract between the defendant and the city under which the
railroad was constructed and leased by the city, and which provided for
the making of trackage agreements, did not impose any obligation on the
defendant to construct its part of the line so as to permit the use of cars
which thereafter might be adopted by the other railroad of a type
radically different from those in common use, but on the contrary the
contracts for the construction of different parts of the line entered into by
the city and the defendant and by the city and the other railroad spe-
cifically required cars of a type that might be used interchangeably on
the existing railroads and provided that the cars should be of approved
type and dimensions.

APPEAL by the defendant, Interborough Rapid Transit Com-
pany, from an order of the Supreme Court, made at the New
York ——— Term and entered in the office of the clerk
of the county of New York on the —— day of ——————,
granting a peremptory writ of mandamus to compel the Inter-
borough Rapid Transit Company to comply with an order
issued by the Transit Construction Commissioner.

*J. C. Edwards* of counsel [*Frederick G. Watson* with him on
the brief; *James L. Quackenbush,* attorney], for the appellant.

*Louis C. White* of counsel [*William G. Fullen* with him on
the brief; *Louis C. White,* attorney], for the respondent.

PAGE, J.:

The order from which this appeal is taken directs the issu-
ance of a peremptory writ of mandamus requiring the Inter-
borough Rapid Transit Company (hereinafter referred to
as the Interborough) to comply in all respects with an order
of the Transit Construction Commissioner. This order pro-
vides that the Interborough shall make all such changes in
the equipment of certain subdivisions of the Steinway Tunnel
Line *as may be necessary* to provide for the exercise of the
trackage rights reserved by the city and granted to the New
York Municipal Railway Corporation (hereinafter referred to

452    People ex rel. Delaney v. Interborough R. T. Co.

First Department, July, 1920.    [Vol. 192.

as the Municipal Railway). This order is very indefinite. It does not point out what changes are to be made. It does not recite any reason why the structural equipment, including third rails and station platforms, must be radically altered merely for the purpose of allowing another company to run its cars over the tracks. This order leaves a wide discretion somewhere.

It is well settled that the proper function of the writ of mandamus is to compel the doing of a specific thing based upon a legal right. (*People ex rel. Lehmaier* v. *Interurban R. Co.*, 177 N. Y. 296, 301.) This would require a reversal but we do not place our decision solely upon the ground that the order is too indefinite to warrant the granting of the motion for a peremptory writ of mandamus. There is a far more vital question than that involved in this proceeding. In order that a peremptory writ of mandamus may be issued it must appear that there is a clear legal right to have that done which it is petitioned should be commanded to be done.

The facts which have given rise to this controversy, stated in the opposing affidavits and the letter of the president of the Interborough, which in this proceeding must be accepted, are as follows: Subsequent to the execution of contracts Nos. 3 and 4 and the trackage agreement hereinafter discussed, a type of car was adopted by the New York Consolidated Railroad Company (hereinafter referred to as the Consolidated), the assignee of the Municipal Railway, fourteen to sixteen inches wider than the cars operated by the Interborough on this line, and this type of car is equipped with a contact shoe not adapted to the contact rail of the Interborough, now in use on the Steinway Tunnel Line. It is impossible to use these cars on the Steinway Tunnel Line, as the space between the center of the rails and the edge of the platforms of the stations is not sufficient to permit of the passage of the wider cars; and the trains cannot be operated with the contact shoe on the new type of car. Compliance with the order of the commissioner will require either a change of the location of the contact rails to meet the requirements of the cars of the Consolidated, which would enable that company to operate its trains, but would render impossible the operation of the Interborough trains and prevent an interchange of cars

with other lines operated by it; or the laying of a second contact rail, with the necessary wiring, and the installation of additional machinery in the present power houses, or the construction of new ones. Further, the platforms on the seventeen stations involved will have to be cut back, so that there will be a space of from ten to twelve inches between the platforms of the cars of the Interborough and the station platforms. If any right exists for such radical changes it must be found in the contracts.

The city of New York acting by the Public Service Commission for the First District entered into the so-called dual contracts, known as contracts No. 3 and No. 4, with the Interborough and the Municipal Railway respectively, for the construction, equipment, maintenance and operation of rapid transit railroads, in addition to those then existing. In contract No. 3 the city agreed to construct certain additional rapid transit railroads and the Interborough agreed to contribute the sum of $58,000,000 towards the cost of such construction and at its own expense to equip, maintain and operate such additional rapid transit railroads, which are referred to in the contract as the " railroad," for a term of years therein specified. The railroad so to be constructed, equipped, operated and maintained is described in said contract as the Steinway Tunnel Line and is subdivided into five parts. The contract further provides in respect of subdivisions III, IV and V of said line that the city reserves the right to permit the Municipal Railway, its assigns or any other operator to use the tracks, structures and line equipment for at least half the capacity thereof if required, upon terms and conditions which shall be reasonable, and may be agreed upon between the Commission, the Interborough, and such other lessee or operators, to be embodied in a supplementary agreement.

Contract No. 4 is in general similar to contract No. 3, in that it provides for the construction by the city of New York, the contribution to the cost of construction by the Municipal Railway, and the equipment, maintenance and operation for the term of the lease therein described by the Municipal Railway. It further provides that the city agrees to furnish the lessee with trackage rights over subdivisions III, IV and V of the Steinway Tunnel Line to be constructed under con-

tract 3, for at least half the capacity thereof, if required, the terms and conditions of such use to be reasonable and to be agreed upon between the Commission, the Municipal Railway and the Interborough, and to be embodied in a supplementary agreement. There is also imposed upon the Municipal Railway the obligation to operate over such portion of the Steinway Tunnel Line to the same extent as if such trackage rights were a part of the railroad described in contract No. 4.

In accordance with the provisions of contracts Nos. 3 and 4, a supplementary agreement known as the " trackage agreement " was entered into between the city of New York, acting by the Public Service Commission of the First District, the Interborough and the Municipal Railway, embodying the terms and conditions for the use of subdivisions III, IV and V of the Steinway Tunnel Line by the Municipal Railway.

The existing structure of those subdivisions was completed in accordance with the plans and specifications theretofore adopted and the Interborough commenced the operation of the line in 1917 and ever since has been operating it. The commencement of the operation of these lines by the Interborough was authorized and directed by the Public Service Commission of the First District.

A portion of the Broadway-Fourth Avenue Line of the Consolidated, described in contract No. 4, which will soon be completed, connects by means of a tunnel East Sixtieth street in the borough of Manhattan, with the Queens Borough Plaza station of the Steinway Tunnel Line in the borough of Queens. In order to prepare for the enjoyment of the trackage rights by the assignee of the Municipal Railway, the Transit Construction Commissioner (the successor in this behalf of the Public Service Commission of the First District, Laws of 1919, chap. 520, adding to Pub. Serv. Comm. Law, art. 5-A), made the order above mentioned on January 13, 1920, directing the Interborough, *First.* To make all changes in subdivisions III, IV and V of the Steinway Tunnel Line as may be necessary for the exercise of the trackage rights reserved by the city in contract No. 3, granted to the Municipal Railway in contract No. 4, and provided for in the trackage agreement; and complete the same before April

15, 1920. *Second.* To submit for approval by the Commissioner or chief engineer detailed plans, specifications and contracts for making such necessary changes in the equipment. *Third.* To make such necessary traffic arrangements as will be required to allow the city to make certain structural changes, consisting of the changing of the alignment of tracks at the three stations on the concrete viaduct of the Corona Line and the cutting off of a portion of the platform overhang on all stations on subdivisions III, IV and V of the Steinway Tunnel Line.

The president of the Interborough under date of February 3, 1920, wrote to the Transit Construction Commissioner pointing out the impracticability of obeying the order and quite freely stating the objections of the company to it, and then stated: " In the circumstances, it is constrained to advise you that the terms of such order are not accepted by it and will not be obeyed by it, and it objects to your taking any steps toward the making of the structural changes therein referred to." Thereupon this proceeding was instituted and a peremptory writ of mandamus was ordered issued requiring in terms the doing of those things directed to be done by the order of the Commissioner.

The counsel for the respondent bases his argument on the right to joint operation of this line by the Interborough and the Municipal Railway reserved by the city in contract No. 3, granted to the Municipal Railway in contract No. 4, and provided for in the trackage agreement. He does not point out any portion of any of these contracts that provides for alterations or changes in the structure, to adapt it to the accommodation of a different type of equipment, if the Municipal Railway or its assign should later decide on such use; nor to any right reserved to the city to enter upon the property for the purpose of making such changes. He stands upon the broad proposition that the city having granted the right to the Municipal Railway to jointly operate, and the Municipal Railway having agreed to operate, the city is bound to afford the assignee of the Muncipal Railway a full opportunity to perform its contract, and if thereby the Interborough rights are interfered with, it must yield, thus giving to the holder of mere trackage rights a superior right to the lessee of

456   People ex rel. Delaney v. Interborough R. T. Co.

First Department, July, 1920.        [Vol. 192.

the property. An examination of the contracts shows that such a construction does violence to the intention of the parties, which was to secure an equality in the use of the tracks and line equipment of the structure. In any particular where a divided authority would lead to confusion, the Interborough's authority was to be paramount. To cite but two instances; each company was to be permitted to operate such a service over the lines operated jointly as may be required for its traffic, but neither company was at any time to be permitted to use more than one-half of the capacity of such lines, if at such time the other company required for its traffic one-half of such capacity. The Interborough was to accord the Municipal Railway equal facilities with itself for the prompt and efficient operation and dispatch of the cars and trains of the Municipal Railway. But it was provided that the Interborough should direct the operation of the Municipal cars and trains while they were on the lines operated jointly; that interlocking towers and signals controlling the movements of cars and trains of the Municipal Railway should be operated by the Interborough, and cars and trains should be considered under the control and direction of the Interborough after entering the interlocking limits of such lines eastbound and until clear of such interlocking limits westbound.

There had been operated for many years by the Interborough and its predecessors, rapid transit lines consisting of elevated and subway systems, in the boroughs of Manhattan, Bronx and Brooklyn; in the contracts these were referred to as " Existing Railroads." The cars on these railroads, although differing in many respects, were so constructed that they could be operated interchangeably over either road, and the contact shoe, third rail and width of cars were such as to adapt themselves to the facilities of both systems. Contract No. 3 provides that the cars to be operated by the Interborough " shall be of such type and dimensions as can conveniently be operated on the existing railroads and shall be interchangeable with such equipment." The equipment specifications in contract No. 3, and with the addition of the words in brackets in contract 4, provided as follows: " Contact rail for the supply of power to the trains shall be installed throughout the length of all tracks. * * * The standards of construction adopted

for such contact rail shall permit of interchange of rolling stock [with other similar rapid transit railways now operating in the City and also as far as practicable] with the Existing Railroads." "The motive power shall be such as to permit the interchange of rolling stock [with other similar rapid transit railways now operating in the City and also. as far as practicable] with the Existing Railroads." Contract No. 4 provides that "passenger cars shall be of approved type and dimensions." When we consider that all these roads under the terms of the various contracts will eventually become the property of the city, the purpose to have them so constructed and equipped as to permit of a common operation, and to have cars of a type to be used interchangeably, becomes manifest, and the "approved type and dimensions" cannot mean some new type of different dimensions to be approved thereafter, but must mean of the approved type and dimensions then being operated. The structure of the Steinway Tunnel Line was built and equipped in accordance with contract No. 3, in exact conformity with the plans and specifications prepared and approved by the Public Service Commission. The cars are of a type that can be operated on the existing railroads, and the cars of such railroads can be operated on this line. The stations were built in conformity with the plans and specifications likewise approved, for the safe and convenient receiving and discharge of passengers. After these contracts were executed, the Consolidated, in disregard of the express provisions and the clear intent of the contract, adopted a type of car different from that theretofore used in New York city or elsewhere, equipped with a contact shoe not adapted to operate on any of the other similar or existing railroads. This may have been by design to prevent the common operation, or it may have been through oversight. Having thus failed to observe the contract, the Consolidated is in no position to demand alteration in contact rails and platforms to enable it to operate trains of such cars on the Steinway Tunnel Line. Neither has the Transit Construction Commissioner power to order changes, or the city power to make alterations, for such a purpose. The local authorities ratified the plans and specifications under which this structure, permanent in character and costly in construction, was built; they authorized

the terms and conditions under which joint operation was to be allowed. These were reduced to contracts and executed by all the parties interested, without reservation of the right to change. The Interborough thereby has a property right, a right arising out of contract, of which it cannot be deprived. (*City of New York* v. *Hudson & Manhattan R. R. Co.*, 188 App. Div. 294; affd., 229 N. Y. 141.) The Interborough is under obligation, both by contract and as a common carrier of passengers, to maintain the facilities of transportation so that its passengers may have a safe place to board and leave its trains. To create a space of ten or twelve inches between the platforms of the cars and the stations would be a menace to the traveling public. On the lines of the existing railroads there are eight stations, built upon curves, thus creating a similar space. In the nine years of their operation from 1911 to 1919, inclusive, there have been 5,559 claims made for accidents due to the existence of such spaces, many of which have resulted in actions in the courts of the county of New York, in the settlement of which the Interborough has paid $560,271.31. This conclusively shows that the changes contemplated in the seventeen stations of the Steinway Tunnel Line should not be allowed to be made. The safety of the traveling public should be the first concern of the companies and of the public authorities. If any alterations are necessary to permit of a joint operation of this line, the changes must be made by the Consolidated so that its cars can use the structure as it now exists.

For these reasons the order should be reversed, with ten dollars costs and disbursements, the motion denied and the proceeding dismissed, with fifty dollars costs and disbursements to be taxed.

Clarke, P. J., Dowling, Smith and Greenbaum, JJ., concur.

Order reversed, with ten dollars costs and disbursements; motion denied and proceeding dismissed, with fifty dollars costs and disbursements to be taxed.